1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JOSE URENA, as an individual, on behalf          No.  1:18-cv-00517-NONE-EPG
      of himself and others similarly situated,
12                                                      FINDINGS AND RECOMMENDATIONS,
                     Plaintiff,                         RECOMMENDING THAT PLAINTIFF'S
13                                                      MOTION FOR FINAL APPROVAL OF
             v.                                         CLASS ACTION SETTLEMENT BE
14                                                      GRANTED AND MOTION FOR
      CENTRAL CALIFORNIA ALMOND                         ATTORNEYS' FEES AND COSTS, AS
15    GROWERS ASSN.,                                    MODIFIED HEREIN

16                   Defendant.                         (ECF Nos. 52 & 52-1)

17                                                      FOURTEEN-DAY DEADLINE

18

19           Plaintiff Jose Urena, on behalf of himself and others similarly situated ("Plaintiff"), filed

20    the complaint commencing this class-action lawsuit on April 13, 2018. (ECF No. 18). On August

21    11, 2020, the Court adopted the undersigned's findings and recommendations and granted

22    preliminary approval to a proposed class-action settlement, as modified. (ECF No. 47). The Court

23    approved the parties' revised class-action notice on September 16, 2020, (ECF No. 51), and

24    Plaintiff filed a motion for final approval of the settlement agreement on January 8, 2021, (ECF

25    No. 52), and a motion for attorneys' fees and costs concurrently therewith, (ECF No. 52-1). The

26    Court held a hearing on February 5, 2021. On February 10, 2021, Plaintiff Urena filed a

27    supplemental declaration concerning the amount of time he spent on this action. (ECF No. 55).

28    On February 18, 2021, Plaintiff's counsel Kelsey M. Szamet ("counsel") filed a supplemental

1    declaration concerning reimbursement of costs.

2          The motion for final approval is now before the Court. For the following reasons, the

3    Court recommends granting final approval of the class-action settlement and the motion for

4    attorneys' fees and costs, as modified herein.

5    **I.      BACKGROUND**

6          This action proceeds on Plaintiff's first amended complaint, filed August 13, 2018.

7    Plaintiff brought nine claims. (ECF No. 15). Plaintiff alleged violations of laws concerning meal

8    and rest periods; unpaid wages; unfair, unlawful and fraudulent business practice; and claims

9    derivative of the foregoing.

10          **A.      Proposed Settlement**

11          The parties filed a notice of settlement on November 4, 2019. (ECF No. 33). Plaintiff filed

12    a motion for preliminary approval of the settlement on April 3, 2020. (ECF No. 37). That

13    settlement agreement has been amended following various court orders. (ECF Nos. 47-50, 52-3).

14    The Court now describes the basic background for the settlement and its current terms.

15                1.      Background of Reaching Settlement

16          The parties engaged in discovery before reaching the settlement. (ECF No. 52-2 at 3).

17    After two rounds of mediation by a retired California judge, the parties entered into a settlement

18    agreement. (*Id.* at 3-4). The agreement was modified twice during the preliminary approval

19    process. (ECF Nos. 47-50).

20                2.      The Court's Initial Concerns

21          First, Plaintiff stated in his motion for preliminary approval that the maximum possible

22    settlement amount was $29,511,809, of which $24,668,810 were penalties. (ECF No. 37-1 at 10).

23    Plaintiff argued this was proper due to weaknesses in his case. (ECF No. 37 at 23-29). At the

24    preliminary approval hearing, counsel argued that Plaintiff's deposition weakened his case. The

25    Court ordered the parties to file additional information concerning his deposition, (ECF No. 40),

26    which Plaintiff subsequently did, (ECF No. 41). In its findings and recommendations, the Court

27    found that preliminary approval of the $375,000 fund—which amounts to 1.266% of the stated

28    maximum recovery amount—was appropriate but "Counsel may wish to garner additional

1  support for this substantial discount at final approval." (ECF No. 46 at 16). The district judge's

2  order adopting the findings and recommendations highlighted this concern. (ECF No. 47 at 2).

3        Second, at preliminary approval, Plaintiff sought of up to $125,000 of attorney's fees,

4  which amounts to 33-⅓% of the total settlement fund. The findings and recommendations noted

5  that the amount was above the 25% benchmark in the Ninth Circuit and, accordingly, counsel

6  should expect to justify the fee award at the final approval hearing. (ECF No. 46 at 22-23). The

7  district judge's order adopting the findings and recommendations endorsed these concerns. (ECF

8  No. 47 at 2).

9        Third, the Court noted that the proposed *cy pres* recipient, Court Appointed Special

10  Advocates (CASA) of Fresno and Madera Counties, (ECF No. 37-2 at 11), appeared not to meet

11  the relevant standards for *cy pres* recipients due to the lack of connection between Plaintiff's

12  claims and the recipient and that it was premature to determine a *cy pres* recipient. (ECF No. 46

13  at 19-20). The district judge's order adopting indicated that the recipient should "be determined

14  only after the funds are initially distributed." (ECF No. 47 at 3).

15        Fourth, after an initial review of the motion for final approval, the Court also ordered

16  Plaintiff's counsel to explain certain of its stated costs, noting that some of the explanations

17  provided did not appear to meet various legal standards. (ECF No. 53). Counsel filed a

18  supplemental declaration on that point. (ECF No. 56).

19        Finally, at the hearing, the Court granted Plaintiff leave to file a declaration in support of

20  the request for a $5,000 enhancement to Plaintiff for his work on this case. (*See also* ECF No. 54)

21  (minute order concerning the same). Plaintiff filed such a declaration, stating he worked for 25-35

22  hours on this matter. (ECF No. 55).

23              3.      Settlement Terms

24                   *a)*     *Class*

25        The settlement class includes "all who are employed or have been employed by

26  Defendant, in the State of California, and who have worked one or more shifts as a nonexempt

27  hourly agricultural employee, as defined by the California Labor Code, Industrial Welfare

28  Commission Wage Order 8-2001, and 29 U.S.C. §1892(3) from April 13, 2014 through April 30,

1   2019." (ECF No. 52-3 at 5).

2                            *b)*      *Payments*

3          The agreement creates a $375,000 common fund, with the proposed following payments:

4          Maximum Settlement Fund: $ 375,000.00
5          Class Representative Enhancements: $ 5,000.00
           Class Counsel's Fees: $ 125,000.00
6          Class Counsel's Costs: $16,542.51
           Private Attorney General Act ("PAGA") Payment: $11,250 (75% of $15,000)
7          Settlement Administration Costs: $10,441.45
           *Net Settlement Amount*: $206,766.04
8

9   (ECF No. 52-14 at 5) (proposed order); (*see also* ECF Nos. 52-3 at 13 (proposed settlement

10  agreement, which does not contain counsel's final costs); 56 at 2 (declaration of Plaintiff's

11  counsel, revising counsel's costs)).

12                           *c)*      *Release*

13         The settlement agreement releases Released Claims for the Class Period (April 13, 2014

14  through April 30, 2019). (ECF No. 52-3 at 2, 7). Released Claims has a broad definition:

15         "Released Claims" means any and all claims, debts, liabilities, demands,
16         obligations, penalties, guarantees, costs, expenses, damages, action or causes of
           action of whatever kind or nature, contingent or accrued, that are alleged in the
17         Action or that reasonable could have arisen out of the same facts alleged in the
           Action, including, but not limited to, all claims related to the Migrant and
18         Seasonal Agricultural Worker Protection Act. This Release shall include, without
           limitation, claims that were raised, or that reasonably could have been raised,
19         under the applicable Wage Order 8-2001 and California Labor Code provisions,
20         including Labor Code §§203, 226.7, 510, 512, 1194, and 1194.2 (collectively, the
           "Released Claims"). The period of the Released Claims shall extend through the
21         Class Period. The Parties agree that the judgment, and release of claims provided
           herein, shall have *res judicata* effect. The definition of Released Claims shall not
22         be limited in any way by the possibility that Plaintiff or Class Members may
           discover new legal theories or legal arguments, based on the facts alleged in the
23         Action, and not alleged in the operative pleadings in the Action but which might
           serve as an alternative basis for pursuing the same claims, causes of action, or
24         legal theories of relief falling within the definition of Released Claims.
25

26  (ECF No. 52-3 at 4-5).

27                     4.      Motion for Final Approval

28         The Court highlights several aspects of the motion for final approval.

                                              4

1    First, the settlement administrator filed a declaration stating that 310 (or perhaps 311)

2    notice packages were mailed to the class members. After various skip-tracing efforts, only 19

3    were determined to be undeliverable. (ECF No. 52 at 3). The administrator also declared that if

4    the Court approves the various costs, the average class member will receive a $656.94 settlement.

5    (*Id.* at 345). This number appears to be incorrect as it assumes that class counsel will receive

6    $19,000 in litigation costs, which is the maximum amount class counsel can request in the

7    proposed settlement agreement. At final approval, they now request $16,542.51. (ECF No. 56).

8    Accordingly, if the Court grants the motion in full, the average class member should receive

9    $664.84.

10   Second, no class members have opted out. (ECF No. 52-10 at 4). One class member sent

11   the settlement administrator an objection via email, which the settlement administrator describes

12   as deficient. (*Id.*). The objection reads, in relevant part, as follows: "My name is Albertico

13   Camacho Jr. I object with the proposed settlement. I was affected not only financially but

14   physically. I had to visit my doctor and the emergency room numerous times due to the long

15   hours without the proper rest and breaks. The long hours took a toll on my body and had many

16   health issues afterwards." (ECF No. 52-12 at 2) The settlement administrator attempted to reach

17   the objector but received no response. (ECF No. 52-10 at 4). At the hearing, Plaintiff's counsel

18   represented that her firm also attempted to reach the objector by mail and by calling the objector

19   at the number in their records but had not received a response.

20   Third, after the hearing, Plaintiff submitted two additional declarations. The first was from

21   Plaintiff Urena, who estimated he spent 25-35 hours in connection with this matter. (ECF No. 55).

22   The second was from Plaintiff's counsel, which provided additional information concerning

23   counsel's costs. (ECF No. 56).

24   **II.      LEGAL STANDARD FOR CLASS CERTIFICATION AND SETTLEMENT**

25   "A difficult balancing act almost always confronts a district court tasked with approving a

26   class action settlement." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "On the one

27   hand, . . . 'there is a strong judicial policy that favors settlements, particularly where complex

28   class action litigation is concerned.'" *Id.* (citations omitted). "But on the other hand, settlement

5

1   class actions present unique due process concerns for absent class members, and the district court

2   has a fiduciary duty to look after the interests of those absent class members." *Id.* (citations and

3   internal quotation marks omitted).

4   "To guard against this potential for class action abuse, Rule 23(e) of the Federal Rules of

5   Civil Procedure requires court approval of all class action settlements, which may be granted only

6   after a fairness hearing and a determination that the settlement taken as a whole is fair,

7   reasonable, and adequate." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir.

8   2011) (footnote added); *Staton v. Boeing Co.*, 327 F.3d 938, 972 n.22 (9th Cir. 2003) (court's role

9   is to police the "inherent tensions among class representation, defendant's interests in minimizing

10   the cost of the total settlement package, and class counsel's interest in fees").

11   Rule 23(e)'s class settlement process generally proceeds in two phases. In the first phase,

12   the court conditionally certifies the class, conducts a preliminary determination of the fairness of

13   the settlement (subject to a more stringent final review), and approves the notice to be provided to

14   the class. *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). The purpose of the initial

15   review is to ensure that an appropriate class exists and that the agreement is non-collusive,

16   without obvious deficiencies, and within the range of possible approval as to that class. *See True*

17   *v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1062 (C.D. Cal. 2010); Newberg on Class

18   Actions § 13:13 (5th ed. 2014).

19   In the second phase, the court holds a full fairness hearing where class members may

20   present objections to class certification, or the fairness of the settlement agreement. *Ontiveros*,

21   303 F.R.D. at 363 (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir.

22   1989)). Following the fairness hearing, the court is to consider all of the information before it and

23   confirm that class certification is appropriate, and that the settlement is fair, reasonable, and

24   adequate. *See Valdez v. Neil Jones Food Co.*, 2015 WL 6697926, at * 8 (E.D. Cal. Nov. 2, 2015);

25   *Miller v. CEVA Logistics USA, Inc.*, 2015 WL 4730176, at *3 (E.D. Cal. Aug. 10, 2015). "Any

26   class member may object to the proposal if it requires court approval under this subdivision (e).

27   The objection must . . . state with specificity the grounds for the objection." Fed. R. Civ. P.

28   23(e)(5)(A).

1    **III.    DISCUSSION**

2           Here, the first phase of the Rule 23(e) class settlement process—the conditional approval

3    of the class, the preliminary approval of the Settlement, and the approval of the notice to be

4    provided to the class members—has been completed. (ECF Nos. 47, 51). The parties are now

5    before the Court for the second phase of the Rule 23(e) class settlement process: (1) final class

6    certification and (2) final approval of the Settlement. (*See* ECF No. 52).

7           **A.    Final Class Certification**

8           In this Court's findings and recommendations (ECF No. 46), adopted in full by the district

9    judge, (ECF No. 47), the Court made a preliminary finding that the proposed settlement class

10   satisfies the requirements of Federal Rule of Civil Procedure 23(a) for purposes of settlement.

11   The Court also made a preliminary finding that the proposed settlement class met the

12   predominance and superiority requirements of Federal Rule of Civil Procedure 23(b)(3), which

13   provides: "A class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds

14   that the questions of law or fact common to class members predominate over any questions

15   affecting only individual members, and that a class action is superior to other available methods

16   for fairly and efficiently adjudicating the controversy." Thus, the class was conditionally certified

17   under Federal Rule of Civil Procedure 23(c)(1), for the purposes of settlement only. (ECF Nos. 46

18   at 6-12; 47 at 2-3.) There is no indication that the Court's preliminary determination that the

19   proposed settlement class satisfies the requirements for class certification was in error.

20          Thus, for the reasons set forth in this Court's findings and recommendations

21   recommending conditional class certification (ECF No. 46 at 6-12), and in the district judge's

22   order adopting in full those findings and recommendations, (ECF No. 47 at 2-3), the Court finds

23   the requirements for final class certification under Federal Rule of Civil Procedure 23(a) and (b)

24   to be satisfied. The Court therefore recommends certifying the following class, for settlement

25   purposes only:

26          all who are employed or have been employed by Defendant, in the State of
27          California, and who have worked one or more shifts as a nonexempt hourly
            agricultural employee, as defined by the California Labor Code, Industrial
28          Welfare Commission Wage Order 8-2001, and 29 U.S.C. §1892(3) from April 13,

7

1    2014 through April 30, 2019.

2    **B.     Adequacy of Notice**

3    "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

4    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by*

5    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "Notice is satisfactory if it 'generally

6    describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

7    investigate and to come forward and be heard.' " *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d

8    566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th

9    Cir. 1980)). Any notice of the settlement sent to the class should alert class members of "the

10   opportunity to opt-out and individually pursue any state law remedies that might provide a better

11   opportunity for recovery." *Hanlon*, 150 F.3d at 1025.

12   Here, the Court already reviewed and approved the contents of the notice. (ECF Nos. 47-

13   51) (order granting preliminary approval to proposed settlement conditioned, in part, on revised

14   notice; counsel's declaration containing revised notice; order requiring further revisions;

15   counsel's additional declaration containing revisions to notice; order setting final approval

16   hearing upon review of the final revisions).

17   The settlement administrator initially mailed 310 copies of the notice. Defendant located

18   one more class member, and the settlement administrator mailed a 311th copy. After performing

19   skip-traces and remailing settlement packets, the settlement administrator determined 19—

20   amounting to 6.1% of the class members—were undeliverable.  (ECF No. 52-10 at 2-3).

21   The Court recognizes that the settlement amount is not particularly large, so further steps

22   to find 19 class members might be prohibitively expensive. Moreover, this action was filed in part

23   under the Migrant and Seasonal Agricultural Worker Protection Act, which indicates that some of

24   the employees in the class may no longer live in the area. Thus, the court concludes adequate

25   notice was provided to the class here. *See Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994)

26   (court need not ensure all class members receive actual notice, only that "best practicable notice"

27   is given); *Winans v. Emeritus Corp.*, No. 13-cv-03962-HSG, 2016 WL 107574, at *3 (N.D. Cal.

28   Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made to reach all class

1 members, it does not require that each individual actually receive notice."). The court accepts the

2 reports of the settlement administrator and finds sufficient notice has been provided satisfying

3 Federal Rule of Civil Procedure 23(e)(1).

4     **C.**    **Final Approval of the Proposed Settlement**

5     To be approved, a class-action 'settlement must be "fair, reasonable, and adequate.'"

6 *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009) (quoting Fed. R. Civ.

7 P. 23(e)(2)).

8
9     A district court may consider some or all of the following factors when assessing
    whether a class action settlement agreement meets this standard:

10     [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely
11     duration of further litigation; [3] the risk of maintaining class action status
    throughout the trial; [4] the amount offered in settlement; [5] the extent of
12     discovery completed, and the stage of the proceedings; [6] the experience and
    views of counsel; [7] the presence of a governmental participant; and [8] the
13     reaction of the class members to the proposed settlement.

14 *Id.* (internal quotation marks and citations omitted; indentation modified; brackets in original).

15     "The list of factors is by no means an exhaustive list of relevant considerations," *Staton v.*

16 *Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003), and "[t]he relative degree of importance to be

17 attached to any particular factor will depend upon and be dictated by the nature of the claim(s)

18 advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each

19 individual case," *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688

20 F.2d 615, 625 (9th Cir. 1982). "Not all of these factors will apply to every class action settlement.

21 Under certain circumstances, one factor alone may prove determinative in finding sufficient

22 grounds for court approval." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221

23 F.R.D. 523, 525–26 (C.D. Cal. 2004) (citing *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370,

24 1376 (9th Cir. 1993)). The Court now turns to the factors.

25     1.    <u>Strength of Plaintiff's Case</u>

26     "When assessing the strength of plaintiff's case, the court does not reach any ultimate

27 conclusions regarding the contested issues of fact and law that underlie the merits of this

28 litigation.  The court cannot reach such a conclusion, because evidence has not been fully

1    presented. Instead, the court is to evaluate objectively the strengths and weaknesses inherent in

2    the litigation and the impact of those considerations on the parties' decisions to reach these

3    agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012)

4    (internal quotation marks and citations omitted); *accord Amaro v. Gerawan Farming Inc.*, No.

5    1:14-CV-00147-DAD-SAB, 2020 WL 6043936, at *3 (E.D. Cal. Oct. 13, 2020) (same).

6         Broadly, Plaintiff argues that his claims are weak for two reasons. First, discovery did not

7    validate several of the key allegations in his complaint. Second, a California Court of Appeals

8    ruling, which the California Supreme Court has granted review for, threatens much of the

9    maximum possible recovery.

10                         *a)      Meal and Rest Period Claims*

11                              i.     Relevant California Law

12        California's Industrial Welfare Commission Wage Order 8-2001, 8 C.C.R. § 11080

13   ("Wage Order 8-2001"), "applies broadly to industries handling products after harvest," *Perez v.*

14   *Leprino Foods Co.*, No. 1:17-CV-00686-AWI-BAM, 2021 WL 53068, at *4 (E.D. Cal. Jan. 6,

15   2021), and is "to be accorded the same dignity as statutes," *Brinker Restaurant Corp. v. Super.*

16   *Ct.*, 53 Cal. 4th 1004, 1027 (2012). It mandates, in relevant part, that employers must both

17   provide and keep records of meal and rest breaks. Wage Order 8-2001(7), (11), (12).

18        Subdivision 11 of Wage Order 8-2001 concerns meal periods. "Employers must afford

19   employees uninterrupted half-hour periods in which they are relieved of any duty or employer

20   control and are free to come and go as they please." *Brinker*, 53 Cal. 4th at 1037 (summarizing

21   "subdivision 11 of most of the IWC's wage orders"); *accord* Wage Order 8-2001(11).

22        Subdivision 12 concerns rest periods. Under the regulation, employers generally must

23   provide ten minutes of break for every four hours of work. Wage Order 8-2001(12)(A).

24        Subdivision 7 concerns records. Employers must keep "Time records showing when the

25   employee begins and ends each work period. Meal periods, split shift intervals and total daily

26   hours worked shall also be recorded. Meal periods during which operations cease and authorized

27   rest periods need not be recorded." Wage Order 8-2001(7)(A)(3).

28

1                         ii.     Whether Class Members Received Meal and Rest Periods

2                    Plaintiff alleged that Defendant violated California labor law because the employees'

3       mandated, 30-minute meal periods were "routinely . . . shorter than 30 minutes, or were never

4       offered at all." (ECF No. 15 at 7). However, as noted in the Court's earlier findings and

5       recommendations, (ECF No. 46), that allegation does not align with Plaintiff's deposition

6       testimony, during which he testified that he received lunch breaks every day:

7
       Q. Were there any days that you worked in the stockpile yard where you do not
8        believe that you took a lunch break?
       . . .
9        THE WITNESS: I can't remember.
       BY MR. BAUER: Q. Okay. Do you remember any days working in the stockpile
10        yard where you didn't go eat your lunch that you had put in the refrigerator at
       Paradise?
11        A. No.

12      (ECF No. 52-8, Urena Dep. Tr. at 110:4-14).

13                   Plaintiff also did not time how long his lunch breaks were, and he seemed to admit they

14      were 30 minutes long:

15
       Q. And how often would you time how long your lunch break was?
       A. Well, we didn't really have to, because they would come on the Gator and
16        scoop us up. They would be -- I mean, they would be there on the dot. As soon as
       the break was over, they would be there and pick us up.
17        Q. So as soon as the 30 minutes was up, they would come and grab you –
       A. Yeah.
18        Q. -- take you back to the stockpile yard?
       A. Or holler at us. Yeah.
19

20      (*Id.* at 104:14-24).

21                   Plaintiff asserts Defendant's rest-break policy was unlawful because "the rest break policy

22      did not say that the rest periods must be uninterrupted, and that Class Members would be relieved

23      of all work duties during the break." (ECF No. 52-2 at 5-6).

24                   Plaintiff's case also relies on Defendant's written policies, which Plaintiff alleges were

25      deficient. (ECF No. 15 at 7). Plaintiff claims that before July 2, 2018, the policies restricted where

26      class members can take breaks in violation of California Law. (ECF No. 52-2 at 5). Defendant

27      modified its policies on July 2, 2018. (*Id.*).

28      ///

1    Counsel represented at the hearing that courts apply a rebuttable presumption that
2    employers who lack valid rest policies do not provide those breaks. Plaintiff argues that even if
3    Defendant's policy is unlawful, Defendant may be able to rebut the presumption against it.
4    Counsel attested that Defendant proffered an employee's declaration saying he was free to leave
5    the premises for breaks. (ECF No. 52-2 at 7). At the final approval hearing, counsel represented
6    that other employees counsel interviewed corroborated those declarations.

7    Plaintiff further argues that in discovery it found that Defendant did not adequately record
8    meal periods, which, according to Plaintiff, indicates that Defendant unlawfully automatically
9    deducted meal breaks from pay. (ECF Nos. 52 at 17-18; 52-2 at 6). The absence of records, if
10   true, indicates that Defendant may have violated Wage Order 8-2001(7)(A)(3).

11   This failure to keep the records might create a rebuttable presumption that meal and rest
12   breaks were not provided. *Cole v. CRST Van Expedited, Inc.*, 932 F.3d 871, 873, 877 (9th Cir.
13   2019) (certifying to California Supreme Court: "Does an employer's failure to keep records for
14   meal and rest breaks taken by its employees create a rebuttable presumption that the meal and rest
15   breaks were not provided?" and noting the unsettled nature of the answer to that question). But
16   even if such a rebuttable presumption exists, it appears that Defendant may have met its burden,
17   as discussed above.

18   In sum, Plaintiff has pointed to significant evidence—including his own deposition
19   testimony—indicating that Defendant provided the required meal and rest breaks. The Court finds
20   that for settlement purposes, these claims have several weaknesses that could prevent recovery.
21   These weaknesses favor approving the settlement.

22                              *b)      Unpaid Wages Claim*

23   Plaintiff alleged that Defendant improperly rounded off employees' hours and
24   automatically deducted thirty minutes for first meal breaks, which were not provided. Plaintiff
25   argues that a substantial portion of this claim relates to meal breaks. Those claims, as discussed
26   above, have many weaknesses. Plaintiff does not discuss the specific risks associated with
27   Defendant's rounding policy. (*See* ECF No. 52 at 20).

28   ///

12

1    Given counsel's representation that the larger issue concerned meal breaks, and the

2 weaknesses with the meal breaks claim, the Court finds that the strength of the unpaid wages

3 claim favors approval of the settlement.

4                              c)      *Derivative Claims*

5    Plaintiff claims that Defendant (1) failed to provide accurate itemized wage statements at

6 separation in violation of the California Labor Code § 226(a); (2) failed timely to pay all wages

7 due on separation, triggering waiting-time penalties under Labor Code § 201; (3) violated the

8 Migrant and Seasonal Agricultural Worker Protection Act based on the previous allegations; (4)

9 engaged in unfair, unlawful and fraudulent practices; and (5) owes penalties under the Private

10 Attorney General Act ("PAGA"), California Labor Code § 2698 *et seq.* The court addresses these

11 in order.

12    First, Defendant proffered declarations from employees saying that they were provided

13 with the itemized wage statements at separation. (ECF No. 52-2 ¶ 43). Such declarations weaken

14 Plaintiff's claims.

15    The second type of derivative claim constitutes most of Plaintiff's claimed damages in this

16 action. Plaintiff alleged that Defendant's failure to provide appropriate compensation after

17 denying class members meal and rest breaks entitles the class to $24,668,810 of waiting-time

18 penalties. (ECF No. 52-2 ¶¶ 40, 53). The Court has already discussed the factual weaknesses in

19 these claims. In addition, the California Court of Appeal's decision in *Naranjo v. Spectrum*

20 *Security Services* is a substantial legal risk. 40 Cal. App. 4th 444 (2019), *as modified on denial of*

21 *reh'g* (Oct. 10, 2019), *review granted*, (Jan. 2, 2020).

22    One central issue facing the court in *Naranjo* was whether failing to provide meal or rest

23 periods under Labor Code § 226.7 can lead to derivative waiting time and wage statement

24 penalties under Labor Code §§ 203 and 226. The court concluded that such failures do not permit

25 derivative penalties. *Naranjo*, 40 Cal. App. 4th at 474 ("Accordingly, we hold that section 226.7

26 actions do not entitle employees to pursue the derivative penalties in sections 203 and 226. The

27 denial of section 203 waiting time penalties is affirmed. The award of itemized wage statement

28 penalties must be reversed.").

1    The parties reached their settlement agreement after *Naranjo* was decided but before the

2  California Supreme Court granted review. Because "*Naranjo* is pending review by the California

3  Supreme Court, it has no binding or precedential effect, but may be considered persuasive."

4  *Sanchez v. New York & Co. Stores, Inc.*, No. 2:20-CV-02380, 2020 WL 5498066, at *3 (C.D.

5  Cal. June 29, 2020) (citing Cal. Rule of Court 8.1115(e)(1)). With that in mind, courts have split

6  in how they treat *Naranjo*.

7    In *Sanchez*, the Central District of California followed *Naranjo* despite the pending

8  review. 2020 WL 5498066, at *3-4. It cited five cases reaching the same conclusion, including a

9  findings and recommendations pending before District Judge Drozd:

10    *Betancourt v. OS Restaurant Services, LLC*, No. B293625, 2020 WL 2570839, at
      *5 (Cal. Ct. App. Apr. 30, 2020) (noting "[w]e agree with *Ling* and *Naranjo* that a

11    plaintiff is not entitled to recover penalties for waiting time and wage statement
      violations based on claims of nonprovision of rest or meal periods"); *Garbyo v.*

12    *Leonardo Bros.*, No. 1:15-cv-01487-DAD-JLT, 2020 WL 2765661, at *7–8 (E.D.
      Cal. May 28, 2020) (recommending dismissal of wage statement claim that was

13    derivative of the rest period claim based on the court's reasoning in *Naranjo*);
      *Morales v. Paschen Management Corp.*, No. CV-19-2505-MWF (GJSx), 2019

14    WL 6354396, at *9 (C.D. Cal. Sept. 27, 2019) (holding that plaintiff's claim for
      inaccurate wage statements based on defendants' alleged deduction of meal

15    breaks was duplicative and § 226(a) is not intended to permit such double
      recovery); *Pyara v. Sysco Corp.*, No. 2:15-cv-01208-JAM-KJN, 2016 WL

16    3916339, at *7 (E.D. Cal. July 20, 2016) (granting judgment on the pleadings as
      to plaintiff's claim for inaccurate wage statements based on failure to pay meal

17    and rest break premiums because such a basis would result in improper double
      recovery); *Parsittie v. Schneider Logistics Inc.*, No. CV-19-3981-MWF (AFMx),

18    2019 WL 8163645, at *7 (C.D. Cal. Oct. 29, 2019) (finding plaintiff failed to state
      a claim under § 226(a) where it was premised on defendants' alleged failures to

19    provide meal or rest breaks because such a claim would be duplicative).

20

21  *Id.* at *3.

22    This view is not unanimous. District Judge Anthony W. Ishii of this district has held

23  otherwise. *See Bates v. Leprino Foods Co.*, No. 2:20-CV-00700-AWI-BAM, 2020 WL 6392562,

24  at *5 (E.D. Cal. Nov. 2, 2020); *Howell v. Leprino Foods Co.*, No. 1:18-CV-01404-AWI-BAM,

25  2021 WL 168291, at *4 (E.D. Cal. Jan. 19, 2021).

26    Given the weight of authority and the risks to the waiting-time penalties, the Court finds

27  that the weaknesses in the claims favor approving the settlement. *See Amaro*, 2020 WL 6043936,

28  at *4 (E.D. Cal. Oct. 13, 2020) (District Judge Drozd, after noting the uncertainty from *Naranjo*,

14

1  concluding that, with respect to waiting-time penalties, "it is far from certain that [plaintiffs]

2  would have prevailed on those claims or achieved full recovery on them, particularly in light of

3  the substantial appellate risks. The court finds that consideration of this factor weighs in favor of

4  granting final approval of the settlement in this action.").

5      Plaintiff's remaining derivative allegations are weak because Plaintiff's underlying

6  allegations are weak, as discussed above.

7          2.     The Risk, Expense, Complexity, and Likely Duration of Further Litigation

8      "[T]here is a strong judicial policy that favors settlements, particularly where complex

9  class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir.

10  2008). As a result, "[a]pproval of settlement is preferable to lengthy and expensive litigation with

11  uncertain results." *Johnson v. Shaffer*, No. 2:12–cv–1059 KJM AC P, 2016 WL 3027744, at *4

12  (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, 2011 WL 5511767, at *10 (E.D. Cal.

13  Nov. 10, 2011). This factor weighs in favor of approving the settlement.

14          3.     Risk of Maintaining Class Action Status Through Trial

15      This case has not been certified to be tried as a class action. Particularly in light of the

16  weaknesses of Plaintiff's case, this factor weighs in favor of settlement.

17          4.     The Amount Offered in Settlement

18      In considering the amount offered in the settlement, "[t]he proposed settlement is not to be

19  judged against a hypothetical or speculative measure of what might have been achieved by the

20  negotiators. . . . [T]he very essence of a settlement is compromise, a yielding of absolutes and an

21  abandoning of highest hopes." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir.

22  1998) (internal quotation marks and citation omitted). Instead, the Ninth Circuit (and district

23  courts in it) have "long deferred to the private consensual decision of the parties." *Rodriguez*, 563

24  F.3d at 965. As the Ninth Circuit explained in *Rodriguez*:

25          the court's intrusion upon what is otherwise a private consensual agreement
           negotiated between the parties to a lawsuit must be limited to the extent necessary
26          to reach a reasoned judgment that the agreement is not the product of fraud or
           overreaching by, or collusion between, the negotiating parties, and that the
27          settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

28

1    *Id.*

2        The $375,000 settlement amount is just shy of 1.3% of the maximum possible recovery of

3   $29,611,809. Plaintiff argues that the substantial discount is warranted given the weaknesses in

4   his case, the views of experienced counsel, and the presence of a mediator to conduct arms-length

5   negotiations. (ECF No. 52 at 23-27). Additionally, "[t]here is no evidence of fraud, overreaching,

6   or collusion." *Rodriguez*, 563 F.3d at 965. Moreover, the payment "is in cash, not in kind, which

7   is a good indicator of a beneficial settlement." *Id.* Furthermore, the parties attended mediation. It

8   did not initially settle at mediation but did once *Naranjo* created significant appellate risks.

9        It appears to the Court that Plaintiff encountered factual challenges to the case that

10   justified a relatively low settlement in relation to the maximum total recovery.

11        That said, the individual payment to the class members is material.  As described above,

12   the average each class member will receive is above $650.  This is a material payment that

13   represents a real and non-negligible benefit to each class member.

14             5.      <u>Nature of Settlement Negotiations; Extent of Discovery; Stage of</u>

15                <u>Proceedings; Experience and Views of Counsel</u>

16        In its findings and recommendations regarding preliminary approval, the Court found that

17   these factors favored approving the settlement. (ECF No. 46 at 16-17). The Court finds that the

18   factors still favor approval for the same reasons as before.

19             6.      <u>Presence of Governmental Participant</u>

20        As discussed in the findings and recommendations regarding preliminary approval,

21   Plaintiff must submit a proposed settlement to the California Labor & Workforce Development

22   Agency ("LWDA"), which may then express its views. (ECF No. 46 at 17-18). On June 5, 2020

23   Plaintiff submitted the proposed settlement in connection with a preliminary approval of the

24   settlement. (ECF No. 44). Plaintiff submitted the proposed settlement for the final approval

25   motion on January 8, 2021. (ECF No. 52-9). The LWDA had not filed a statement with the Court

26   concerning the settlement. Given that the LWDA has not commented despite ample opportunity

27   to do so, the Court finds that his factor weighs in favor of approving the settlement.

28   ///

1        7.      Reaction by Class Members

2            No class members opted out. At the hearing, counsel represented that her law firm had

3    fielded calls from class members asking when they would be paid. These indications favor

4    approval.

5            Camacho was the only objector.[1] Counsel and the settlement administrator attempted to

6    reach Camacho, but both were unsuccessful. The Court will review Camacho's objection even

7    though the settlement administrator indicated that the objection was deficient.[2] *See Hefler v. Wells*

8    *Fargo & Co.*, 2018 WL 6619983, at *10 n.10 (N.D. Cal. Dec. 18, 2018) (evaluating objections

9    despite their non-compliance with Rule 23(e)'s command to "state with specificity the grounds

10   for the objection" because Rule 23's advisory committee comments note that "a class member

11   who is not represented by counsel may present objections that do not adhere to technical legal

12   standards"), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020) (affirming district

13   court's rejection of objection to attorney fee award).

14           The objection indicates, without detail or supporting evidence, that class members were

15   not provided with required breaks. Thus, the objection appears to bolster the strength of

16   Plaintiff's case. However, counsel represented that they were unable to reach Camacho and that

17   their other investigations—together with various sworn testimony—presented substantial

18   weaknesses to the case. Thus, the Court finds that this unsworn objection does not sufficiently

19   strengthen Plaintiff's case to warrant rejecting the settlement.

20           In sum, only one class member objected, and none opted out. Counsel represented that

21   class members sought to find out when they would be paid. Thus, the Court finds that class

22   members' reaction is generally positive and that this factor weighs in favor of approval.

23       **D.      Settlement Administrator**

24           The Court preliminarily approved a $10,441.45 payment to the settlement administrator in

25   this action, ILYM Group, Inc. (ECF No. 47). The Court sees no reason to revisit this conclusion.

---

[1] As above, the objection reads, in relevant part, as follows: "My name is Albertico Camacho Jr. I object with the proposed settlement. I was affected not only financially but physically. I had to visit my doctor and the emergency room numerous times due to the long hours without the proper rest and breaks. The long hours took a toll on my body and had many health issues afterwards." (ECF No. 52-12 at 2)

[2] The settlement administrator did not state why it found the objection deficient.

E.       **Attorneys' Fees and Costs**

Here, Plaintiff seeks attorneys' fees of 33.33% of the gross settlement amount and $16,542.51 for litigation costs. (ECF Nos. 52-1 at 2 (attorneys' fees); 56 at 2 (correcting litigation cost amount)). The Court addresses these requests in turn.

1.       Attorneys' Fees

a)       *Legal Standards*

When a negotiated class action settlement includes an award of attorneys' fees, courts evaluate the fee award in the overall context of the settlement. *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002). At the same time, a court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *Rodriguez*, 563 F.3d at 968.

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the attorneys' fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id.*; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (in common-fund class-action case, Ninth Circuit will "review a court's award of fees and costs to class counsel, as well as its method of calculation for abuse of discretion"). "Reasonableness is the goal" under either approach. *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 949. In the Ninth Circuit, "the benchmark percentage is 25%." *Id.* "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances

18

1  indicate that the percentage recovery would be either too small or too large in light of the hours

2  devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus*

3  *Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Percentage awards of between twenty and thirty

4  percent are common. *See Vizcaino*, 290 F.3d at 1047; *In re Activision Sec. Litig.*, 723 F. Supp.

5  1373, 1377 (N.D. Cal. 1989) ("This court's review of recent reported cases discloses that nearly

6  all common fund awards range around 30% even after thorough application of either the lodestar

7  or twelve-factor method."). Nonetheless, an explanation is necessary when the district court

8  departs from the twenty-five percent benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th

9  Cir. 2000).

10      Factors courts may consider when assessing a requested percentage include:

11      the extent to which class counsel achieved exceptional results for the class,
12      whether the case was risky for class counsel, whether counsel's performance
         generated benefits beyond the cash settlement fund, the market rate for the
13      particular field of law (in some circumstances), the burdens class counsel
         experienced while litigating the case (e.g., cost, duration, foregoing other work),
14      and whether the case was handled on a contingency basis.

15  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954–55 (internal quotation marks omitted).

16  The Ninth Circuit has permitted courts to award attorneys' fees using this method "in lieu of the

17  often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942.

18      There is a three-step process to apply the percentage-of-the-fund method:

19
20  • *First*, the court will ascertain the size of the fund against which the percentage
     will be taxed.
21  • *Second*, the court will review the percentage counsel seek, ensuring that the
     fee resulting from application of that percentage is reasonable.
22  • *Third*, the court will sometimes undertake a lodestar cross-check, comparing
     the percentage award to the time counsel expended on the case at the
23  prevailing hourly rates, to further ensure the fee's reasonableness.

24  5 Newberg on Class Actions § 15:68 (5th ed.); *cf. Vizcaino*, 290 F.3d at 1050-51 (approving use

25  of lodestar cross-check).

26      In conducting the lodestar cross-check, the court determines the lodestar amount by

27  multiplying a reasonable hourly rate by the number of hours reasonably spent litigating the case.

28  *See Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 (9th Cir. 2001). The product of this

1    computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of*

2    *Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973,

3    978 (9th Cir. 2008). District Judge Drozd has summarized the standard as follows:

> "Courts in the Ninth Circuit calculate an award of attorney's fees using the lodestar method, whereby a court multiplies the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Telles v. Li*, No. 5:11-CV-01470-LHK, 2013 WL 5199811, at *15 (N.D. Cal. Sept. 16, 2013). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A district court should also exclude from the lodestar fee calculation any hours that were not "reasonably expended," such as hours that are excessive, redundant, or otherwise unnecessary. *See id.* at 434.
>
> In assessing fee applications, the reasonable hourly rates are calculated according to the prevailing market rates in the relevant legal community. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). Typically, the "relevant legal community" is the forum district and the local hourly rates for similar work should normally be employed. *Gonzalez*, 729 F.3d at 1205.

15   *Tenorio v. Gallardo*, No. 1:16-CV-00283-DAD-JLT, 2019 WL 3842892, at *2 (E.D. Cal. Aug.

16   15, 2019) (string citations omitted; certain internal quotation marks omitted).

17        In *Tenorio*, a class-action case brought by farm workers pursuing similar claims as

18   Plaintiff does, the Court found that the relevant legal community was the entire Eastern District of

19   California, not just Fresno. *Id.* at *2 n.1 ("The court recognizes that judges in the Eastern District

20   of California frequently distinguish between the Fresno and Sacramento communities in

21   determining hourly rates. The general rule for awarding attorneys' fee rates, however, is that the

22   rates of attorneys practicing in the forum district are used. . . . This court has located no authority

23   indicating that hourly rates for attorneys in Sacramento may not be used to guide the court's

24   award of such fees in cases originating in Fresno, particularly in specialized fields of litigation."

25   (internal quotation marks and citations omitted)).

26                      *b)    Application*

27        Here, the attorney fee request exceeds the 25% benchmark in this circuit. Thus, the Court

28   looks to see whether there are "special circumstances" to adjust the percentage recovery "in light

20

1  of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers*, 804 F.2d at

2  1311. The Court looks to the following factors:

3 
4 
5 
6

> the extent to which class counsel achieved exceptional results for the class,
> whether the case was risky for class counsel, whether counsel's performance
> generated benefits beyond the cash settlement fund, the market rate for the
> particular field of law (in some circumstances), the burdens class counsel
> experienced while litigating the case (e.g., cost, duration, foregoing other work),
> and whether the case was handled on a contingency basis.

7  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954-55.

8  <center>i.    Exceptional Results</center>

9      Counsel essentially argues that obtaining any results at all is exceptional. (ECF No. 52-1

10  at 12) ("Class counsel obtained an excellent result for the Settlement Class in view of the strength

11  of this case, the possible range of recoveries, and the great risks posed in continuing the litigation.

12  . . . Despite these risks, Plaintiff and class counsel recovered $375,000 on behalf of the Settlement

13  Class, that the class members would likely not have recovered independent of this action."). 

14  Indeed, Plaintiff's own motion for final approval argues primarily that a very low recovery

15  amount is justified given the challenges of the case. While the Court appreciates that this

16  settlement provides a material benefit to class members, it cannot say that the results are in any

17  way exceptional given the relatively low recovery.

18  <center>ii.    Risk of Case</center>

19      It does not appear that there was a high degree of risk at the foiling of the case.  Although

20  counsel argues it encountered challenges based on Plaintiff's deposition testimony, this is a

21  standard about of risk in pursuing litigation.  Under the circumstances here, the risks do not merit

22  an upward departure.

23  <center>iii.    Additional Benefits to Class Members</center>

24      Counsel did not argue this point. However, the Court notes that this lawsuit was filed in

25  April 2018 and Defendant changed its meal and rest policies in July 2018.

26  ///

27  ///

28

<center>21</center>

1  iv.   Contingency and Financial Burden

2      Counsel took this matter on a contingency basis. Counsel's firm has shouldered

3  $16,542.51 in costs, (ECF No. 56), and anticipates spending between 5 and 20 more hours

4  overseeing the settlement payout procedures, (ECF No. 52-2 at 19).

5      This case was filed on April 13, 2018. (ECF No. 1). The parties filed a notice of

6  settlement on November 4, 2019—about nineteen months after filing—stating the parties had

7  settled in principle and were working on a long-form settlement agreement. (ECF No. 33). The

8  parties filed their initial settlement agreement on April 3, 2020. (ECF No. 37). This is not an

9  exceedingly long time for a class action to proceed. However, as discussed with the lodestar

10  cross-check below, counsel spent a substantial amount of time on this case compared to the size

11  of the settlement. Thus, the Court finds that the contingency nature and financial burden warrant a

12  slight upward departure from the benchmark.

13  v.   Other factors

14      Counsel argues that her firm's skill favors a higher award. (ECF No. 52-1 at 12). At the

15  hearing for final approval, counsel argued that this was not a case where they sought a quick

16  settlement. Rather, counsel extensively litigated this action. Plaintiff filed a complaint and an

17  amended complaint (ECF Nos. 1 & 15), and fully briefed a successful motion to compel, (ECF

18  Nos. 23, 26 & 28). Although Plaintiff's damaging deposition testimony came out on June 12,

19  2019, (ECF No. 52-8), Plaintiff continued litigating the case, (ECF Nos. 29 (joint scheduling

20  report filed June 20, 2019); 31 (telephonic conference held June 28, 2019)). The parties finally

21  filed a notice of settlement on November 4, 2019—nearly five months after the damaging

22  testimony. (ECF No. 33). This factor is further confirmed by the lodestar cross-check, as

23  explained below.

24  vi.   Lodestar Cross-Check

25      Counsel, their year of admission, stated hourly rate, hours billed, and stated total are

26  shown in the chart below:

27  \\\

28  \\\

22

| Attorney | Practicing Since | Years of Experience [3] | Stated Rate | Hours Billed | Stated Total |
|---|---|---|---|---|---|
| Eric Kingsley | 1996 | 24 | $825 | 32.7 | $26,977.50 |
| Kelsey Szamet | 2008 | 12 | $585 | 121.8 | $71,253 |
| David Keledjian | 2016 | 4 | $385 | 51.5 | $19,827.50 |
| Justin Aufderhar | 2017[4] | 2 | $325 | 166.6 | $54,145 |
| David Penner | 2018 | 2 | $375 | 16.2 | $6,075 |
| **TOTAL** | | | | | **$178,278** |

Counsel states these hourly rates are "fair and reasonable and are comparable to or less than those charged by my colleagues in California and the national market for prosecuting or defending class actions." (ECF No. 52-2 at 22).  As further evidence, they cite to the Laffey Matrix. (*Id.* at 24). District Judge Drozd has rejected use of the Laffey Matrix:

> In seeking these rates, plaintiffs rely upon the Laffey Matrix, "a widely recognized compilation of attorney and paralegal rate data[.]" (Doc. No. 265 at 17.) They then modify the Laffey Matrix and apply it to the Bakersfield market, since this action arose in Bakersfield. (*Id.* at 18.) In opposing this market, defendants assert that this court should apply Fresno rates. (Doc. Nos. 279 at 15; 283 at 16–17.) Both parties miss the mark. As already discussed, the proper rate to be applied is the prevailing rate in the Eastern District of California. *See Tenorio v. Gallardo*, No. 1:16-cv-00283-DAD-JLT, 2019 WL 3842892, at *4 (E.D. Cal. Aug. 15, 2019); *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, No. 1:15-cv-01136-DAD-EPG, 2019 WL 2725336, at *7–8 (E.D. Cal. July 1, 2019). This court recently awarded rates of $525.00 per hour to an attorney with approximately twenty-five years of experience, *See Tenorio*, 2019 WL 3842892, at *4, and a survey of other recent cases within the Eastern District indicates that this is near the top of the market for hourly rates in this district. *See, e.g.*, *Early v. Keystone Rest. Grp., LLC*, No. 2:16-cv-00740-JAM-DB, 2019 WL 918211, at *5 (E.D. Cal. Feb. 25, 2019) (stating that "the relevant market in this case is the rate prevailing in the Eastern District of California" and approving an hourly rate of $530.00 in an employment discrimination case for an attorney with over 30 years' experience). Because plaintiffs request hourly rates in excess of these rates, some

---

[3] Obtained by subtracting the year the attorney began practicing from 2020. The year 2020 was selected because that was the year the settlement agreement was filed. (ECF No. 37). The exception is Mr. Aufderhar, who left the firm in 2019. (ECF No. 52-2 at 23). His date of admission was subtracted from 2019.

[4] Counsel's declaration states that Mr. Aufderhar received his law degree in 2016 but it does not indicate his year of admission. (ECF No. 52-2 at 23). The website of the State Bar of California indicates that Mr. Aufderhar was admitted on January 12, 2017. *See* http://members.calbar.ca.gov/fal/Licensee/Detail/314023. The Court takes judicial notice of this public record. *See* Fed. R. Evid. 201; *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.").

1    reduction is warranted.

2    *C & C Properties v. Shell Pipeline Co.*, No. 1:14-CV-01889-DAD-JLT, 2019 WL 6341047, at

3    *20 (E.D. Cal. Nov. 27, 2019).

4         Thus, California and national attorneys are not the correct comparison. Instead, the rates

5    used for the lodestar crosscheck should be those in this district. *See Tenorio* 2019 WL 3842892,

6    at *2 & n.1. In *Tenorio*, as relevant here, the court approved the following hourly rates, some of

7    which were modified:

8
| Year of Admission | Approx. Years of Experience[5] | Hourly Rate Approved |
|---|---|---|
9
| 1996 | 23 | $525 |
| 2006 | 13 | $375 |
10
| 2010 | 9 | $300 |
| 2014 | 5 | $250 |
11

12         In addition, in a case concerning fees for healthcare-litigation attorneys, the court awarded

13    associates with zero-to-three years' experience $200/hour and four years' experience $300/hour.

14    *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, No. 1:15-CV-01136-DAD-EPG, 2019 WL

15    2725336, at *8 (E.D. Cal. July 1, 2019).

16         Next, the Court must determine the appropriate number of hours for the crosscheck.

17    Counsel did not provide any details concerning the hours worked. This makes it very difficult to

18    determine whether the hours spent were reasonable. A failure to properly document hours can

19    warrant a reduction in the number of hours used in a lodestar:

20         " 'Block billing' is 'the time-keeping method by which each lawyer and legal
         assistant enters the total daily time spent working on a case, rather than itemizing
21         the time expended on specific tasks.' " *Welch v. Metro. Life Ins.*, 480 F.3d 942,
         945 n.2 (9th Cir. 2007). A federal court may appropriately impose a "haircut"
22         percentage reduction that is "no greater than 10 percent...based on its exercise of
         discretion and without a more specific explanation." *Moreno v. City of*
23         *Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Block-billing warrants a
         reduction in the number of hours spent on a matter where, because of the manner
24         of billing, the court cannot ascertain whether such hours could "reasonably be
         billed to a private client." *Gonzalez*, 729 F.3d at 1202.
25

26    *C & C Properties*, 2019 WL 6341047, at *22.

27         Here, the billing was not merely block billing, but provided no explanation for the

28    _____
      [5] Obtained by subtracting the year of admission from 2019, which is when the case was decided.

24

amount. Therefore, the Court will reduce the number of hours billed by 10%.

Thus, the Court finds that the following is an appropriate lodestar crosscheck:

| Attorney | Years of Experience | Stated Rate | Revised Rate | Stated Hours | Revised Hours | Total |
|---|---|---|---|---|---|---|
| Eric Kingsley | 24 | $825 | $525 | 32.7 | 29.43 | $15,450.75 |
| Kelsey Szamet | 12 | $585 | $375 | 121.8 | 109.62 | $41,107.50 |
| David Keledjian | 4 | $385 | $300 | 51.5 | 46.35 | $13,905.00 |
| Justin Aufderhar | 2 | $325 | $250 | 166.6 | 149.94 | $37,485.00 |
| David Penner | 2 | $375 | $250 | 16.2 | 14.58 | $3,645.00 |
| **TOTAL** | | | | | | **$111,593.25** |

Based on the foregoing, the Court finds that the work put in by counsel indicates a small departure from the 25% benchmark is warranted to reflect the substantial work put into the case relative to the relatively small fees associated with such a benchmark. *See Six (6) Mexican Workers*, 904 F.2d at 1311 ("The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."). The Court finds that it is reasonable to split the difference between 25 and 33-$\frac{1}{3}$%. Accordingly, the Court recommends awarding fees amounting to 29-$\frac{1}{6}$% of the common fund, or $109,375. This amount is only slightly below the lodestar amount, so reflects a recovery at approximately the reasonable rate for hours expended in the case.

2.      Litigation Expenses

"[A]n attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Sanchez v. Frito-Lay, Inc.*, 2015 WL 4662636, at *20 (E.D. Cal. Aug. 5, 2015), *report and recommendation adopted*, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015); *accord Smith v. American Greetings Corp.*, 2016 WL 2909429, *9 (N.D. Cal. May 19, 2016). "These costs can include reimbursements for: (1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1023-24 (E.D. Cal. 2019).

1    Counsel seeks to recover costs for hotels and travel, photocopies, mailing, legal research,

2    reporting services, filing fees, notices, experts, and mediation. Each of these types of expenses is

3    collectable. *Carlin*, 380 F. Supp. 3d at 1023-24. The Court will highlight two of these expenses,

4    which were the subject of counsel's supplemental declaration. (ECF No. 56).

5    First, counsel seeks $3,335.84 in reimbursement for Westlaw legal research fees.

6    "[R]easonable charges for computerized research may be recovered as attorney's fees . . . if

7    separate billing for such expenses is the prevailing practice in the local community." *Trustees of*

8    *Const. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1258–59 (9th

9    Cir. 2006); *accord Carlin*, 380 F. Supp. 3d at 1023–24. In response to the Court's order for

10   additional declarations, counsel states that the research fees were calculated by apportioning its

11   Westlaw charges based on the month's usage:

12   It is Plaintiff's counsel's usual practice to apportion the costs of its significant
13   Westlaw research subscriptions based on the usage in the month. Accordingly,
     Westlaw calculates the total a la carte charge for each search and determines its
14   price. The research fee can never exceed that a la carte amount. However, the a la
     carte charge is typically significantly higher than the actual research fee charged
15   because Westlaw breaks down, on a pro rata basis amongst all of Plaintiff's
     counsel's cases, all research fees charged by the firm in a month. I believe that
16   such practice is typically the standard industry practice and defense firms
17   routinely pass this charge on to their clients.

18   (ECF No. 56 at 2). Based on this declaration, the Court finds that these costs are reasonable and

19   that a private client would pay such fees. As such, the Court finds the charges are collectable.

20   Second, counsel seeks reimbursement for $1,476.30 paid to Econ One, which rendered

21   expert services. "The services provided by Econ One included detailed analysis of time and pay

22   records and the preparation of a damage model for mediation that Plaintiff's Counsel used to

23   assess potential damages in this matter and to aid in settlement negotiations. Plaintiff's counsel

24   required the retention of these expert witness services in order to correctly evaluate the proposed

25   damages for the Class." (ECF No. 56 at 2-3). Given that explanation, the Court finds a fee-paying

26   client would be expected to pay for these services. Thus, the Court recommends reimbursement

27   of the expert expenses.

28   In sum, the Court finds that counsel seeks reimbursement of only reimbursable,

1    sufficiently documented costs. Thus, the Court recommends permitting the recovery of

2    $16,542.51 in litigation expenses.

3        **F.    Class Representative Enhancement**

4        A district court may award incentive payments to named plaintiffs in class action cases.

5    *Rodriguez*, 563 F.3d at 958–59. The purpose of incentive awards is to "compensate class

6    representatives for work done on behalf of the class, to make up for financial or reputational risk

7    undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a

8    private attorney general." *Id.* To justify an incentive award, a class representative must present

9    "evidence demonstrating the quality of plaintiff's representative service," such as "substantial

10   efforts taken as class representative to justify the discrepancy between [his] award and those of

11   the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Such

12   incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff

13   undertakes a significant reputational risk in suing her former employer. *Rodriguez*, 563 F.3d at

14   958-59.

15       The Ninth Circuit has emphasized, however, that "district courts must be vigilant in

16   scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165

17   (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition,

18   district courts have declined to approve incentive awards that represent an unreasonably high

19   proportion of the overall settlement amount or are disproportionate relative to the recovery of

20   other class members. *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of

21   $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and

22   reducing the award to $15,000, where class representative spent 271 hours on the litigation and

23   relinquished the opportunity to bring several of his own claims in order to act as class

24   representative); *see also Ko v. Natura Pet Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL

25   3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000,

26   comprising one percent of the approximately $2 million common fund was "excessive under the

27   circumstances" and reducing the award to $5,000; *Wolph v. Acer Am. Corp.*, No. C 09–01314

28   JSW, 2013 WL 5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing the incentive award to $2,000

1    where the class representatives did not demonstrate great risk to finances or reputation in bringing

2    the class action). In reducing the award, courts have noted that overcompensation of class

3    representatives could encourage collusion at the settlement stage of class actions by causing a

4    divergence between the interests of the named plaintiff and the absent class members, destroying

5    the adequacy of class representatives. *See Staton*, 327 F.3d at 977–78; *see also Radcliffe*, 715

6    F.3d at 1165.

7         Here, Plaintiff seeks a $5,000 enhancement. Counsel declares that Plaintiff provided

8    information to counsel; compiled documents; met with his attorneys to discuss the status and

9    theories of liability; responded promptly to counsel's communications regarding settlement;

10   prepared for and attended his deposition; and reviewed settlement documents. (ECF No. 52-2 at

11   26-27). Plaintiff estimates he spent 25-35 hours on this matter. (ECF No. 55). Thus, the request

12   amounts to an hourly rate between $142 and $200.

13        Plaintiff argues that he "was at risk for paying for Defendant's legal fees and costs in the

14   event that Defendant prevailed at trial." (ECF No. 52 at 37). The Court rejected this argument in

15   its findings and recommendations:

16
> Plaintiff argues he might have been liable for Defendant's costs if he lost at trial.
17   > He cites to *Koehl v. Verio*, 142 Cal. App. 4th 1313 (2006) for this proposition.
> Although the court there affirmed an attorneys' fee award to the defendants, the
18   > court expressly noted that the plaintiff did not properly argue it. *Id.* at 1328 n.6
> ("[N]owhere in their opening or reply briefs do Appellants make any argument as
19   > to the award of attorneys' fees."). Given the inadequate case law Plaintiff cites,
> the Court will not include this factor in its analysis.
20

21    (ECF No. 46 at 24 n.8). Here, Plaintiff repeats his argument but provides no further support.

22   Thus, the Court again does not include the factor in its analysis.

23        The Court finds that a representative enhancement is permissible but that $5,000 is

24   excessive in light of the relatively low recovery for the class. It is approximately eight times

25   larger than the average settlement amount and amounts to a $142 to $200 hourly rate. The Court

26   recommends reducing this payment to $3,000.

27   ///

28

**G.     Cy Pres Award**

In its findings and recommendations, the Court expressed skepticism that the parties' chosen *cy pres* recipient met the Ninth Circuit's standards but noted that it is premature to select a *cy pres* recipient before the initial distribution of the funds. (ECF No. 46 at 19-20) (citing *Rodriguez*, 563 F.3d at 954 & 966). In the order adopting the findings and recommendations, the Court approved the settlement agreement, subject to the recommendation that "[t]he *cy pres* recipient(s) of unclaimed funds be determined only after the funds are initially distributed." (ECF No. 47 at 3).

At the final approval hearing, Plaintiff appeared to concede that CASA does not meet the standards for being *cy pres* recipient in this action but pointed out that the settlement agreement had not been modified as to this point. The final approval motion offered to provide a waterfall of checks "provided such a distribution makes financial sense considering the administrative fees for the distribution" or to meet and confer with Defendant to select another mutually agreeable non-profit. (ECF No. 52 at 30).

For the same reasons as at the preliminary approval stage, the Court recommends making this determination only after the initial distribution of funds. In addition, in the event funds remain after the initial distribution, the Court recommends ordering the parties to meet and confer to determine whether a waterfall distribution is feasible or whether a new *cy pres* recipient should be named.

**IV.     CONCLUSION AND RECOMMENDATIONS**

As a summary, the Court recommends approving the settlement agreement, as modified to have the following payments:

> Maximum Settlement Fund: $ 375,000.00
> Class Representative Enhancements: $ 3,000.00
> Class Counsel's Fees: $ 109,374.00
> Class Counsel's Costs: $16,542.51
> PAGA Payment: $11,250 (75% of $15,000)
> Settlement Administration Costs: $10,441.45
> *Net Settlement Amount*: $224,391.04

For the foregoing reasons, it is HEREBY RECOMMENDED that:

1) Plaintiff's motion for final approval of the Settlement Agreement (ECF No. 52) be GRANTED, as modified;

2) Approval of the settlement class be GRANTED and defined as:

> all who are employed or have been employed by Defendant, in the State of California, and who have worked one or more shifts as a nonexempt hourly agricultural employee, as defined by the California Labor Code, Industrial Welfare Commission Wage Order 8-2001, and 29 U.S.C. § 1892(3) from April 13, 2014 through April 30, 2019.

3) Plaintiff's request for a class representative enhancement payment be GRANTED, as modified, in the amount of $3,000;

4) Counsel's motion for attorneys' fees (ECF No. 52-1) be GRANTED, as modified, in the amount of $109,375;

5) Counsel's request for costs be GRANTED, in the amount of $16,542.51; and

6) Within ninety days of the initial payments to class members being made, the parties be ordered to file a joint status report concerning (1) the remaining amount in the net settlement; (2) the feasibility of a waterfall payment structure; and (3) alternate proposed *cy pres* recipients.[6]

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)). IT IS SO ORDERED.

Dated:   **March 12, 2021**

/s/ *Erica P. Grosjean*

UNITED STATES MAGISTRATE JUDGE

---

[6] If the parties believe a different timeframe is appropriate, they should inform the Court before the deadline to object to the findings and recommendations.

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28